UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VANGUARD LOGISTICS (USA), INC. f/k/a NACA LOGISTICS (USA), INC., | No. 20-cv-4383 |
| Plaintiff, | |
| - against- | **COMPLAINT** |
| BLUJAY SOLUTIONS LTD. f/k/a KEWILL INC., | |
| Defendant. | |

Plaintiff Vanguard Logistics (USA), Inc. f/k/a NACA Logistics (USA), Inc. ("Vanguard" or "Plaintiff"), by and through its attorneys, Venable LLP, alleges for its Complaint against Defendant BluJay Solutions Ltd. f/k/a Kewill Inc. ("Kewill" or "Defendant") as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendant's fraudulent scheme to sell software it did not have and services it was not capable of providing to Vanguard.  In 2013 and 2014, Vanguard engaged in exhaustive due diligence to select the right software developer to help it replace its legacy software.  Throughout the due diligence process, Defendant represented that its existing suite of software products possessed the necessary functionality to meet Vanguard's business needs.  Defendant misrepresented its capabilities and experience, as well as, the functionality of its existing software products.  Vanguard reasonably relied upon these intentional misrepresentations when it selected Defendant for the project and entered into a Software License and Services Agreement, dated June 8, 2014 ("Agreement").

2.      The Agreement anticipated a project that would take 18 months and cost $3.7 million.  Nearly six years later and $ 7.7 million paid to Defendant and an additional $ 20 million plus invested in the project, and Defendant has not delivered the software functionality it

contractually agreed to provide, including software functionality that Defendant falsely claimed existed at the time.

3.      Today, Vanguard is still using its legacy software, portions of which it has been using since 1984.  Defendant will not deliver what it contractually agreed to provide, admits it is not capable of providing what it represented it could and would provide, and admits that it will only provide certain aspects of what it promised for an additional $6.5 million to $8 million that will require an additional 2-3 years to build.

4.      With this action Vanguard seeks redress for the damage caused by Defendant's fraudulent scheme.  As well as the damage caused by Defendant's numerous material breaches of the Agreement.

## PARTIES

5.      Vanguard is a California corporation with its principal place of business located at 5000 Airport Plaza Drive, Suite 200, Long Beach, California 90815.

6.      Kewill is a Delaware corporation with its principal place of business located at 915 E 32nd Street, Suite B, Holland, Michigan 49423.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Vanguard and Defendant, and because the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

8.      This Court has jurisdiction over both parties pursuant to Section 21.11 of the General Terms and Conditions of the Agreement, in which the Parties "irrevocably submit[ted] to the exclusive jurisdiction of the courts of New York and New York, NY federal courts."

9.      Venue is proper in this Court because the parties expressly consented to this

venue in Section 21.11 of the General Terms and Conditions of the Agreement.

10.     Section 21.11 of the General Terms and Conditions of the Agreement also provides that it is to be interpreted and construed pursuant to the laws of New York.

## FACTUAL ALLEGATIONS

### Background

11.     Vanguard is a Non-Vessel-Operating Common Carrier ("NVOCC").  As an NVOCC, Vanguard provides ocean transportation services to shippers (i.e., importers, exporters) across the United States and around the world.  Vanguard specializes, in particular, in serving as an ocean freight consolidator and providing Less-Than-Container-Load ("LCL") services to its shipper-customers.  Vanguard's LCL services focus on combining cargo from a variety of related and unrelated shippers for purposes of efficiency when loading a shipping container; this also results in lower transport costs for consumers of Vanguard's services.

12.     Crucial to Vanguard's business is its ability to utilize Enterprise Resource Planning ("ERP"), which is the process used by companies to manage and integrate the important portions of its businesses.  A functional ERP software system is designed to integrate numerous business processes and enable the flow of data between them.

13.     Vanguard's current legacy ERP software platform dates back to 1984.

14.     By 2013, Vanguard made the decision to replace its legacy ERP software platform with a more advanced and fully integrated transportation and logistics ERP software platform.  Vanguard invited three software vendors to compete for the opportunity to sell its ERP platform: (i) Kewill; (ii) Enterprise (CargoWise); and (iii) eFreight Suite (eFreight Systems).

15.     Defendant stated at the time that its mission "is to forge the modern supply chain of the future and save the world from traditional logistics." "As a leader in network solutions and

supply chain management, BluJay Solutions helps you optimize your company's future in global economy." Defendant claimed it had applications for: Transportation/Distribution and Customs/Compliance.

16.     CargoWise is a "powerful, deeply integrated platform that puts productivity at the center of global logistics." Its platform "optimises your supply chain across all modes and borders." CargoWise's platforms include: Customs, Optimisation, Enterprise, Transport, Warehouse, Parcel, E-Commerce, Rates and Contracts, Carrier, Geo-Compliance, and Global Data.

17.     eFreight Suite is the flagship product offered by New Age Software & Solutions and was described as "the most comprehensive end-to-end ERP Solution for the Freight and Logistics Industry." eFreight Suite claims to have "embedded industry best practices in software development with our deep domain knowledge and offer[s] EDI capabilities with Ports, Airlines, Shipping Lines, and Customs in multiple countries."

**The Solicitation Process**

18.     Given the importance of this project and the financial commitment required, Vanguard developed an in-depth and sophisticated selection process.

19.     The open and extensive solicitation process was meant to ensure that Vanguard understood each vendor's existing software functionality, each vendor's expertise, and each vendor's experience in developing additional functionalities. Each vendor was also given access to Vanguard's employees and systems, to learn what was necessary to meet Vanguard's requirements.

20.     During the first stage of the selection process, each vendor was invited to provide a demonstration of its products, engage in question and answer sessions, and respond to a

detailed request for information ("RFIs").

21.     Based upon Defendant's representations during this first stage, Vanguard concluded that "Kewill is the most sophisticated, configurable, and automated of the evaluated systems.  It is the benchmark against which the other software packages are measured.  The system provides a superior work-flow process with the ability to set user defined KPI's."  In sum, Vanguard concluded that "Kewill was the standout from an operational viewpoint."  As discussed below, Vanguard would eventually learn that Defendant's representations that formed the basis for this conclusion were false.

22.     Following the initial stage of the review process, Vanguard invited Defendant and eFreight to participate in the second stage of the selection process.  This next stage included days-long workshops, product demonstrations, product testing, and extensive question and answer sessions.

23.     During this more intensive second stage, Vanguard gave Defendant every opportunity to learn and ask questions about Vanguard's specific requirements.

24.     During the second stage, Defendant repeated the misrepresentations it made in the first stage of the selection process and made additional misrepresentations regarding its experience, the functionality of its existing software, the degree to which its software products already met Vanguard's requirements, and its ability to develop software to enhance its existing products to meet Vanguard's requirements.

25.     Each of the following representations made during the solicitation process were false when made.  Upon information and belief, Defendant knew these representations were false and concealed the truth of its software capabilities for the express intent of inducing Vanguard to enter into the Agreement.  Had Vanguard known any one of the following misrepresentations

were false, it would not have entered into the Agreement with Defendant.

### *Defendant Misrepresented the Functionality of Its Existing Software to Vanguard*

26.    Throughout the solicitation process, Defendant falsely represented that its existing suite of fully integrated software products would require minimum customization to meet all of Vanguard's requirements.

    a.   Defendant represented that its existing software products met nearly all of the functionality requirements that Vanguard identified, including for example: tariff filing commodity table; transshipment management process; warehouse management system; cargo release (VLS to CFS); freight release (CFS to customer); gapless invoice numbering; full VAT/GST compliance; interactive worldwide harmonized schedule table; interactive FMC tariff; country specific customs manifests and clearance support, including interfaces; and country specific operations documentation.  All told, Defendant represented it had at least some level of functionality for nearly every requirement Vanguard identified.  This was not true.

    b.   Regarding the warehouse management system, Defendant represented that its existing software product – called Kewill Warehousing (which covers functionality for Container Freight Station or "CFS" and Warehouse Management System or "WMS") – had functionalities for: Sea Air Operations – Billing: internal costs; Sea and Air Operations – Transshipment (3rd Party Transshipments, Transshipment Consolidations, Multimodal Transshipments); Warehouse Enhancement – Status Update; Warehouse Enhancement – Tracking; and Warehouse Enhancement – Packing Certificate.  This was not true.

c.  Defendant also represented it had a fully functional website product – called Kewill Control Tower – that would be integrated into Vanguard's website which would allow Vanguard's customers to view its invoices, shipments, billing, etc.  Upon information and belief, this was not true.  Vanguard has never received the Kewill Control Tower Software.

### *Defendant Falsely Represented that the Kewill Platform Was Fully Integrated*

27.  Throughout the solicitation process, Defendant falsely represented that its existing software products existed on a fully integrated platform.

a.  It claimed its suite of software products provided a "single multimodal transportation platform" "combining all critical areas including: trade, transport, storage, compliance, management and integration" and that its suite of products would be fully integrate and would seamlessly interface with each other.  This was not true.

b.  Defendant represented that its technology provided a "single integrated global database."  This was not true.

c.  Defendant represented that the MOVE Platform, based around trade, transport, store, and comply, included the ability to manage and integrate the platform. And repeatedly represented its "proven integration platform and strategy" with prior clients.  This was not true.

d.  Defendant represented a fluid and integrated Deep Forwarding Functionality, that its application footprint would be connected and possess the ability to integrated different software functions into one operational system. Furthermore, Defendant represented that it had proven experience integrating its software with third parties such as Customs, carriers, and others.  These

representations were not true.

e.  Defendant represented that the four pieces of software it was selling were fully integrated: (1) Kewill Freight Forwarding; (2) Kewill Contracts and Rate Management; (3) Kewill Warehousing; (4) Kewill Control Tower.  This was not true.

### *Defendant Falsely Represented Its Statutory Coverage Capabilities*

28.  Statutory requirements refer to the information a country requires to be transmitted or processed upon import or export.

a.  Examples of statutory requirements include such things as Value-Added Tax ("VAT"), Invoice Handling/Numbering, Security Filings, and Customs Requirements.

b.  Customs Requirements include: the handling of customs and manifest information, the ability to transmit and integrate the manifest information from the system to the customs authorities, and the ability to communicate and receive information from the customs authorities with regards to the information.

29.  Statutory Coverage refers to the functional capabilities of a system to adequately capture, process, manage and transmit or process the information necessary to meet a specified country's statutory requirements.

30.  For both ocean freight forwarding and NVOCC-related services, Statutory Coverage is critical to operating the business.  As a result, it is an accepted industry standard that when a company purports to have global capabilities and operate in a particular country, it has the systems/functionalities to comply with the statutory requirements in that country.

31.  Throughout the solicitation process, Defendant falsely represented that it had a global presence and as such had experience with, understood, and had the technical capability to

8

meet the statutory requirements for all the countries that Vanguard operated in.

    a.  Defendant represented it had a global platform in over 100 countries. This was misleading.

    b.  Defendant represented that in the 25 countries Vanguard listed, "Kewill can confirm that we have live operations in all the countries listed below with our Kewill Forwarding and/or Kewill Logistics Warehousing and Transport Management solutions…solutions cover Air and Ocean operations (all types of Import and Export) as well as Domestic Road, CFS, Transport, and full Warehouse Management. Our Visibility solution is also used extensively across multiple geographies." This was not true.

    c.  Defendant also represented that "in terms of 'local' support, Kewill has offices across many regions, including North America, Asia – Hong Kong, Japan, Singapore, Shanghai, Europe – UK, Netherlands, Germany, Belgium, and we offer a 24/7 global support service for all our solutions." This was misleading.

    d.  Defendant repeatedly represented its "Global Presence" with "7,500 customers in 100+ countries." That its existing software platform combined all critical areas of the freight forwarding business including compliance with statutory requirements. Along with offices on four continents, its platform was presented as a fully integrated platform with invoicing, licensing, and customs capabilities. As part of its Deep Forwarding Functionality, Defendant represented "financial process management – bookings/invoicing" and "integration to third parties." This was not true.

e.  Defendant represented to Vanguard that its employees were "domain experts by country," possessing "local country experts and expert solutions" to "cater for special customs procedures by country with languages and customs relationships," and that its local system "meets local legislative requirements for auditability, reporting, etc. to meet customs authority requirements."  This was not true.

f.  Furthermore, Defendant represented and provided highlights from other NVOCC client projects, including Damco Denmark A/S, a large and sophisticated global NVOCC, that is owned by A.P. Moller-Maersk—the world's largest container shipping operator (Damco recommended Defendant to Vanguard), where through the use of the Kewill Freight Forwarding system they were able to "[p]rovide functionality that is consistent across all regions but also meeting the specific legislative local requirements in each Country." This was misleading as Defendant omitted the fact that Damco was only using a small portion of Defendant's software.

g.  Defendant represented that it could meet financial statutory requirements like VAT and Sales/Excise tax.  Defendant represented that it had the functionality to assign and calculate the applicable rates to the specific services provided. This was not true.

h.  Defendant represented that it could meet statutory requirements for transmitting invoice records and cash receipt information to the respective local authorities, including requirements for transmitting manifest information and files to the respective local authorities. If a company (such as Defendant),

purports themselves to be operational in a certain country, it is an industry and

commercial assumption that the company would (1) be aware of these various

local government requirements, and (2) have systems and capabilities in place

to operate in these countries seamlessly.  This was not true.

32.     Based upon these representations, Vanguard reasonably believed Defendant's

representation that, as part of Defendant's existing suite of software products, Defendant had

capabilities to provide Statutory Coverage for all the countries Vanguard identified.

### Defendant Falsely Represented Its Hub and Gateway Functionalities

33.     "Gateways" and "hubs" are terms used in logistics to describe global trade flows.

A "gateway" often describes a geographic location where the mode of transportation changes,

such as from ocean transportation to inland/trucking transportation.  As an example, a major

seaport like Port of Los Angeles/Long Beach is considered a "gateway."  By contrast, a "hub" is

often used, in furtherance of the "hub-and-spoke" metaphor for transportation networks, to

describe a central location with many inbound and outbound connections of the same mode.  A

large railroad hub like in Kansas City is considered a "hub."

34.     The Hub and Gateway Functionality in Defendant's Software purported to

provide a visual "map" for shipments, with functionality to provide users visibility into relevant

cargo data and documentation for each stage and mode of transportation.

35.     Without Hub & Gateway Functionality, Defendant's software could not be

implemented globally because any further implementation into an operational country needs the

Hub Functionality to fit Vanguard's business needs.

36.     During the solicitation process, Defendant falsely represented that its existing

software possessed the capability to facilitate "Hub & Gateway Processing" as part of its trade

section of the MOVE Platform.

a.  Defendant represented it had "Hub & Gateway Functionality" spread across multimodal operations, events management, and revenue & cost management of its application footprint.  This was not true.

b.  Defendant represented to Vanguard that its "Hub & Gateway Functionality" was developed and operational and would be useable in the platform that Defendant would construct for Vanguard.  This was not true.

### *Defendant Misrepresented Its Software Development Capabilities*

37.  Throughout the solicitation process, Defendant falsely represented its software development capabilities and experience with the intent of leaving Vanguard with the false impression that Defendant was capable of upgrading its existing software to meet Vanguard's business needs.

a.  Defendant represented that its advantage was "Domain Expertise; Implementation & Support" with the ability to install software globally and experience in supporting said software.

b.  Defendant represented another advantage was that it had "Proven Knowledge Transfer capabilities" with large customers learning to implement themselves over time.

### **The Contract**

38.  Following the solicitation process, and in reliance upon the representations made by Defendant during the process, in or around March 2014, Vanguard selected Defendant as the winner and began negotiations of the contract.

39.  The parties executed the Agreement on or about June 18 and 19, 2014, with an effective date of June 8, 2014.  A true and correct copy of the Agreement is attached hereto as Exhibit 1.  Pursuant to the Agreement, Vanguard agreed to purchase Defendant's existing

software products and Defendant agreed to deliver certain customizations to the existing software to meet Vanguard's business needs.

40.     The Agreement consists of three interrelated agreements: (i) the Software License and Services Agreement (the "General Terms and Conditions"), including Exhibit A; (ii) the Schedule 1 Support Services Agreement ("Support Agreement"), and (iii) the Schedule 5 Professional Services Agreement ("Services Agreement").  *See* General Terms and Conditions ¶ 2.

41.     In addition, the parties entered into a Work Order simultaneously with the Agreement.  That Work Order is attached as Attachment 1 to the Services Agreement.  All three agreements and the Work Order were executed simultaneously and are referenced collectively herein as the "Agreement."

42.     In the Agreement, Defendant is referred to as "Kewill" and Vanguard as "Licensee."

43.     The entirety of the Agreement is incorporated by reference here.

### *Defendant's Obligations Under the Agreement*

44.     Pursuant to the General Terms and Conditions, Vanguard purchased a perpetual license to four of Defendant's Software products: (i) Kewill Freight Forwarding ("KFF"); (ii) Kewill Contracts and Rate Management; (iii) Kewill Warehousing ("WMS"); and (iv) Kewill Control Tower.  *See* General Terms and Conditions Exhibit A.

45.     The purpose of the Agreement, and the understanding of Vanguard as it entered into the Agreement based on Defendant's representations, was that Defendant's existing software suite needed only minimal customization to support Vanguard's business needs.

46.     The capitalized term "Software" used throughout the Agreement is defined as:

1.11 "Software" means: (i) the software products designed on Exhibit A in object code only; (ii) Kewill software accessed by Licensee under a Subscription Service; (iii) software Deliverables produced by Kewill Professional Services; and (iv) any Upgrade that Kewill may provide to Licensee from time to time.

General Terms and Conditions § 1.11.

The capitalized term "Deliverable" is defined as:

"Deliverable" - means any item delivered or produced by Kewill or required to be delivered or produced by Kewill as the result of Kewill Professional Services.  Deliverables will generally be described in Work Order documents.

General Terms and Conditions § 1.2.

The capitalized term "Upgrade" is defined as:

"Upgrade" means a release of the Software subsequent to the initial delivery generally made available to Maintenance subscribers in which Kewill has incorporated: (i) changes made to correct errors or defects; (ii) enhancements to provide new capabilities, or (iii) improvements to provide better performance, together with new or revised Documentation.  It does not include new product offerings as determined solely by Kewill.

General Terms and Conditions § 1.14.

The capitalized term "Documentation" is defined as:

Kewill documentation, in any medium, delivered to Licensee including user manuals and training materials relating to the use of the Software.

General Terms and Conditions § 1.3.

47. Pursuant to Section 9.2 of the General Terms and Conditions, Defendant was required to "develop and deliver a blueprint document detailing the Software configuration and the design specifications for all required Software development activities agreed upon by the Parties ('Blueprint')."

48. Upon receipt of the Blueprint, Vanguard had the option to either accept the

Blueprint or terminate the Agreement if it reasonably determined the Software was not suitable for its intended business purposes. *See* General Terms and Conditions ¶ 9.2.

49.    If Vanguard accepted the Blueprint, Defendant was then required to customize its Software to deliver all of the specific functional requirements identified in the Blueprint. *See* General Terms and Conditions § 9.3.

50.    Pursuant to Section 9.3 of the General Terms and Conditions, Defendant was obligated to deliver the configured Software for user acceptance testing ("UAT"). *See* General Terms and Conditions § 9.3.

51.    Vanguard would then either accept or reject the Software. *See id.*

52.    If Vanguard rejected the Software, Defendant was required to correct any non-conformities and re-deliver the software to Vanguard for additional UAT. *See id.*

53.    Vanguard had the right to terminate the Agreement and receive back all fees paid for support and professional services if it rejected the Software three times. *See id.*

54.    In Section 10.2 of the General Terms and Conditions, Defendant warranted to Vanguard that:

> (i) unmodified software and deliverables will perform in all material respects with the Documentation in effect at the effective date for the longer of the period between the effective date and the acceptance of the Blueprint or a period of 90 days from the date the software is initially delivered or deliverable accepted; (ii) Professional Services, Installation Services, and Support Services will be performed in a professional and workmanlike manner, and (iii) Managed Services and Subscription Services will be provided in a manner consistent with industry standards. In addition to termination remedies set forth in Section 9, Licensee's remedy and Kewill's sole and exclusive obligation for a breach of the foregoing warranty shall be for Kewill to re-perform the Services or undertake at its own expense to correct the non-conforming portion of the Service or Software. THE FOREGOING ARE LICENSEE'S REMEDIES FOR BREACH OF WARRANTY.

General Terms and Conditions, §10.2.

15

*Defendant's Obligations Under the Support Services Agreement*

55.     Schedule 1 of the Agreement sets forth Defendant's obligations for "Support Services" for its software offerings.

56.     Defendant's Support Services obligations started no later than when Defendant delivered software to Vanguard for UAT after the Blueprint process.  *See* Support Agreement §1; General Terms and Conditions §§ 1.11, 9.3.

57.     Section 4(II)(iii) of the Support Agreement required Defendant to utilize "[c]ommercially reasonable efforts to resolve defects and errors in the Software and Documentation[.]"

58.     In addition, in Section 4(II)(iv) of the Support Agreement, Defendant was required to provide:

> custom update or changes to the Software required as a result of statutory mandates or regulations of governmental departments or agencies that apply to the then current functionality of the Software for the countries implemented by Kewill for Licensee or otherwise on Kewill's support country deployment list.  The supported country deployment list for Kewill Freight Forwarding is attached hereto as Attachment 1 to Schedule 1.  If updates or changes are requested for countries not supported by Kewill, Kewill shall use its reasonable efforts to accept such Service requests at Service rates set forth in Attachment 1 of Schedule 5.

Support Agreement, § 4(II)(iv).

59.     The "Supported Country Deployment List" listed 67 countries for which Defendant alleged its Software had the functionality to meet its respective Statutory Requirements.

60.     Defendant also itemized 38 additional countries in which Defendant would deploy its Freight Forwarding Software and have Statutory Coverage for "in 2014."

61.     Section 5 of the Support Agreement required Defendant to meet certain incident

handling obligations.   Section 5(ii) identifies four levels of severity of incidents with varying response times for each level.

62.     Section 8 of the Support Agreement obligated Defendant to provide "periodic Upgrades to its Software.  Kewill plans to add the following functionality to Kewill Freight Forwarding in accordance with the specifications and time frames mutually agreed upon by the Parties in the Blueprint and applicable project plan."

63.     The additional functionalities that were identified included:

- **Common Module Functionality**
    - Contract Management Tools (Customer
    - Work Orde  ystem
    - Automat c Multiple party e-docs
- **Export Operations Functionality**
    - Booking
    - System generated Booking Statuses
    - System generated and user definable alerts
    - Load Planning
    - Load Planning Controls/Flag
    - Dock Rece pt Controls/ Flag
    - Automated routing
- **Statutory Functionality**
    - Interact ve Worldwde Harmonized Schedule Table
    - Direct country specific manifest filings and related reports
    - Interact ve Hazardous Table including Customs and Port Interface
- **Web Functionality**
    - Generate Pick up Requests, 3rd Party
    - Online Docs Entry (SLI, etc.)
      Create Work Orders
    - Online Insurance
    - 3rd Party Interface  e g. Shiprite, DrayMate
      Online Quot ng

64.     Pursuant to Section 9 of the Support Agreement, Defendant was required to provide Defendant with technical training, "up to 4 seats in up to 3 Kewill internal technical training classes for the Software to be held at a Kewill facility.  There will be no charge to Licensee, unless Licensee requests a separate, special class for its employees."

### Defendant's Obligations Under the Professional Services Agreement

65.     Schedule 5 to the Agreement sets forth Defendant's obligation to provide

Professional Services to Vanguard subject to the General Terms and Conditions and the terms of Schedule 5. Professional Services were provided pursuant to Work Orders and each Work Order entered into between the parties is governed by the terms of the General Terms and Conditions and Schedule 5. *See* General Terms and Conditions § 1.16.

66.     Schedule 5 of the Agreement describes Defendant's obligations regarding Work Orders:

> Kewill agrees to provide personnel, its expertise and the professional, technical and project management services as are called for in a Work Order. . . .
>
> Kewill shall provide and deliver to Licensee each Deliverable described in an applicable Work Order in material compliance with the requirements for each such Deliverable. . . .
>
> Kewill shall perform all of its respective obligations in accordance with the applicable Work Order . . . .
>
> Kewill agrees to cooperate in good faith with Licensee to staff its project team with professionals qualified to fulfill the roles identified in the applicable Work Order. . . .
>
> If Licensee determines that a Deliverable does not conform to the Acceptance Criteria and so notifies Kewill in a written statement that details the nonconformity (the "Exception Report"), Kewill shall promptly begin to correct such nonconformity within ten (10) business days of receipt of the Exception Report. . . .

Services Agreement §§ 1.1-1.3, 4.2.

67.     Pursuant to the Services Agreement, Defendant promised that it would "ensure that it has adequate personnel to address the requirements of each Work Order and deliver within the agreed timeframes." Services Agreement § 9.1.

### *Defendant's Agreement to Meet Certain Milestones*

68.     Vanguard and Defendant issued the first Work Order as attachment 1 to Schedule 5, which was incorporated by reference into, and governed by the terms and conditions of the

Agreement.  Services Agreement § 9.

69.     That first Work Order contemplated that if Defendant accepted the Software, Defendant would be obligated to implement its software for Vanguard at more than 35 locations, in 7 different countries.  First in the United States and China, and then in 5 additional countries. *See* Services Agreement Attachment 1.

70.     The Work Order also set forth "Key Migration Milestones."  These milestones anticipated the Software configuration of the Freight Forwarding Software would be completed within 108 days and that it would be live in 5 countries within 143 days.

71.     The Blueprint was supposed to have been delivered in 35 days.  *See* Services Agreement Attachment 1.

72.     Then, UAT was supposed to have been completed in 20 days.  *See* Services Agreement Attachment 1.

73.     The time period between the kickoff meeting and full implementation in the first two countries, including the entire Blueprint process and UAT, was supposed to have taken only 18 months.  *See* Services Agreement Attachment 1.

74.     Defendant represented that "provision ha[d] been made to support the next 5 countries to go-live" in less than four months after that.  *See* Services Agreement Attachment 1.

75.     Implementation of the second and third parts of Defendants' software suite were supposed to take 5 months and 2 months, respectively—time periods which were to run concurrently with the time periods outline above.

76.     All in, Defendant promised to customize and deliver all of the software and services in less than 2 years.

77.     A key assumption of the Agreement was that Defendant agreed that the "project

timelines, milestones and tasks which are 'owned' by Kewill[] are achievable as per the mutually developed project plan."

78.     Defendant promised that it would "ensure that it has adequate personnel to address the requirements of each Work Order and deliver within the agreed timeframes."   Services Agreement § 9.1.

### *Anticipated Costs of the Project*

79.     In consideration of the License granted to Vanguard and the development services, Vanguard agreed to pay Defendant up to $3,716,800, as follows:

- $600,000 upon execution of the Agreement;

- $600,000 upon Vanguard's acceptance of the "Blueprint," which is defined in Section 9.2 of the General Terms and Conditions as "a blueprint document detailing the Software configuration and the design specifications for all required Software development activities agreed upon by the Parties";

- $400,000 upon Vanguard's acceptance of "User Acceptance Testing" or "UAT," which is described in Section 9.3 of the General Terms and Conditions as the post-Blueprint process whereby Defendant would deliver customized software to Vanguard, Vanguard would test the software, and Vanguard would reject non-conforming software;

- $320,000 for Support Services, which are described in Support Agreement; and

- $1,796,800 for Professional Services, which are described in the Services Agreement.

*See* General Terms and Conditions § 8.1 and Exhibit A.

**The Blueprint Process**

80.     Upon execution of the Agreement, the parties were to first engage in a technical dialog to identify Vanguard's specific functional requirements, and whether Defendant's then-existing software provided those functions.  The result of that technical dialog was called the "Blueprint."  *See* General Terms and Conditions § 9.2.

81.     Functions which Defendant asserted could be addressed by its existing software suite were referred to as "matches," and functions which could not yet be addressed were referred to as "gaps."

82.     The parties described the purpose and process of the Blueprint in the first Work Order:

> Kewill will conduct a series of iterative workshops with VLS to develop a Blueprint document detailing the system specifications, including all Software configurations, interfaces, integrations and items to be developed per the functional design specifications, required for the Software to meet VLS global business requirements.  The completed Blueprint will be delivered to VLS for acceptance under Section 9.2 of the Agreement.

83.     The first Work Order described this process in additional detail:

> Kewill will configure the Software and deliver all Software development items as specified in the functional design documents referenced in section 9.2 of the [General Terms and Conditions] in accordance with the Blueprint.

84.     Accenture was hired by Vanguard to assist Defendant with its obligation to create the Blueprint.

85.     From July through the end of 2014, Vanguard worked extensively with Defendant and Accenture to identify with exacting detail all of Vanguard's requirements and expectations for the Software Deliverables.

86.     Based upon Defendant's false representations during the solicitation process,

discussed *supra* in paragraphs 18 to 37, Vanguard reasonably believed that Defendant's existing software matched the overwhelming majority of Vanguard's requirements.

87.   By September 2014, the parties discovered that of the 3,000 requirements Vanguard identified, approximately 800 of these requirements were considered "gaps."

88.   Defendant, however, continued to misrepresent its existing software functionality. Accordingly, the true number of gaps actually far exceeded 800.

89.   Upon information and belief, Defendant continued to misrepresent the functionality of its existing software because it knew that if the true number of "gaps" were known, Vanguard would have rejected the Blueprint and terminated the Agreement.

90.   As it was, by September 2014, the parties had already identified a far greater number of "gaps" than had been anticipated indicating that Defendant's representations of its existing software capabilities were false.  As a result, the Blueprint process took longer and cost far more than had been estimated in the Work Order.

91.   Three months into what was supposed to be an 18-month project, Defendant asked for an extension of at least 5 months.  Defendant asked to extend the original timeline to deliver the production code software from the end of 2014 into the third or fourth quarter of 2015.  Furthermore, Defendant provided a revised total estimated Professional Services Budget of $2.21 million, an increase of $412,000 from the initial estimated budget of $1.797 million.

92.   The delay also caused an exponential increase in Vanguard's estimated internal costs for the project.  Due to Defendant's inability to meet the requirements, more money had to be spent internally by Vanguard on people and resources to assist Defendant in solving problems and delivering obligations that Defendant had represented they had the capability and expertise to do and had agreed to provide under the Agreement.

93.     For example, during the Blueprint workshops, Defendant demonstrated a complete lack of understanding of what was required to provide Statutory Coverage experience. The lack of knowledge of the Statutory Coverage requirements were in direct contradiction to Defendant's representations during the solicitation process, where Defendant repeatedly represented its extensive global presence and Statutory Coverage. *See supra* Paragraphs 28 to 32. Vanguard's employees had to spend hundreds of hours and hundreds of thousands of dollars educating Defendant about statutory requirements.

94.     Concerned about the delay, increased costs, Statutory Coverage issues and the number of gaps, Vanguard contemplated rejecting the Blueprint and terminating the contract.

95.     To allay Vanguard's concerns, Defendant's CEO Robert Farrell promised Vanguard that Defendant was committed to making the project work and meeting its obligations under the Agreement. He recognized that the delays were unacceptable but stated that Defendant would work to mitigate any future delays, that Defendant would absorb the costs associated with the delay, and that there would be "no more major gaps" in the functionality of its Software to what Vanguard required.

96.     In addition, Defendant repeated the representations it made during the solicitation process as to which functionalities were already matches between its existing Software and Vanguard's requirements. Not only did Defendant fail to deliver on the functionalities that needed to be developed and added, but the purported matches were actually gaps.

97.     In December 2014, Defendant reaffirmed its prior representations of the existing functionality of its CFS/WMS software product (a/k/a Kewill Warehousing). Specifically Defendant again misrepresented that its Software already possessed the following functionalities: Sea and Air Operations – Billing Internal Costs; Sea and Air Operations – Transhipment 3rd

Party Transhipments;  Sea and Air Operations – Transhipment Consolidations; Sea and Air

Operations – Transshipment Multimodal Transhipments; Provide Warehouse Services –

Warehouse Enhancement – Status Update; Provide Warehouse Services – Warehouse

Enhancement – Tracking; and Provide Warehouse Services – Warehouse Enhancement –

Packing Certificate.

98.     As of the filing of this Complaint, Defendant still has not delivered the

functionality referenced above.  Had Vanguard known of the additional gaps caused by

Defendant's false representations, it never would have agreed to continue with the project.

99.     During the Blueprint process, "Upgrades" functionalities listed in Section 8 of the

Support Services Agreement were further refined and referred to as "the Big 10."  Defendant

represented that it understood what was required to provide the Big 10 functionalities, and that it

had the capability to provide them.

100.     As discussed further herein, Defendant repeatedly affirmed its understanding that

the Agreement required Defendant to deliver the Software customizations that met the Big 10

functionalities requirements.

101.     Upon information and belief, Defendant knew its existing Software functionality

was not as represented and that it did not have the development capabilities to meet the Big 10

functionality requirements.  Defendant concealed the truth with the express intent to induce

Vanguard not to terminate the Agreement.  Defendant's fraudulent scheme depended on

Vanguard continuing to pay Defendant increased fees to keep the project going.

102.     Vanguard reasonably relied upon Defendant's false representations in agreeing to

accept the Blueprint and proceed with Software customization and testing.

103.     Had Vanguard known there were additional gaps because Defendant's Software

did not have the functionality Defendant said it had, Vanguard never would have agreed to proceed with the Agreement.

### *Software Testing*

104.    In or around March 2015, Defendant began providing Vanguard with portions of Software for UAT and acceptance.  In breach of the Agreement, Defendant did not deliver the complete Software Deliverables for UAT.

105.    Virtually every piece of Software failed testing.

106.    Accordingly, in February 2016 Vanguard formally rejected the portions of the Software delivered in January 2016 pursuant to Section 9.3.

107.    As of the filing of the Complaint, Defendant has not delivered any Software that passed UAT and Vanguard has not accepted any of the Software.

108.    The extent of the bugs in Defendant's Software and Defendant's inability to fix them was highly unusual.  Indeed, oftentimes, Defendant would need to provide a patch on top of another patch before a bug was fixed, if they were able to fix the bug at all.  At other times, a patch would solve one bug but create multiple other problems.  On more than one occasion the patch created so many problems that it had to be completely removed, creating a costly disruption to the business and creating major database synchronization issues.

109.    A software patch is a process to repair a bug or security vulnerability after the release of an application. A hot fix is a software patch released to fix a software patch that was supposed to fix problems identified in the software release.

110.    Vanguard's business was damaged by the amount of downtime caused by these failed patches.  In addition, Vanguard had to expend additional resources testing and addressing these issues.

111.    Defendant's inability to develop software that met Vanguard's requirements in

accordance with the Blueprint breached Defendant's obligation to provide Professional Services in a professional and workmanlike manner.

112.   As a result, Vanguard again contemplated terminating the Agreement.

113.   Upon information and belief, in an effort to conceal its fraud and ensure that Vanguard continue to pay its fees to Defendant, Defendant pretended to enter into good-faith negotiations with Vanguard to amend the Agreement.

114.   During these negotiations, Defendant acknowledged it was in breach of the Agreement and that the Agreement required them to deliver the Big 10 functionalities.

115.   Defendant also admitted that its prior representations regarding the functionality of its CFS/WMS software were untrue.  Defendant admitted it was in breach of the Agreement by failing to deliver the requisite functionality and promised to cover the cost of delivering the functionality.

116.   During these negotiations, Defendant also submitted several change request forms to Vanguard in October and November 2015 (both eventually signed by Vanguard in 2016) totaling $1.34M.

117.   In late 2015, before the amendment could be executed, Defendant appointed a new CEO, Douglas Braun ("Braun").  Braun's new message to Vanguard was that an amendment was unnecessary because Defendant understood what was required to meet Vanguard's requirements, it was capable of delivering the Software, and that Defendant wanted to bring the product live as soon as possible.  Braun represented that he understood Defendant had not met its obligations, but Defendant was committed to delivering the platform and the best means of doing so was to go-live in countries where all functionalities were available.

118.   Braun's statements were not true.  In the Spring of 2016, testing was still a failure.

Upon information and belief, Defendant knew at the time that if testing continued it never would have been able to deliver a workable product that would have passed UAT much less meet Vanguard's requirements it promised to deliver pursuant to the Blueprint.  Accordingly, Defendant made a series of misrepresentations to Vanguard, which upon information and belief, were intended to induce Vanguard to (i) not invoke its rights to terminate the Agreement; (ii) forgo the Amendment; (iii) conceal Defendant's ongoing fraud; and (iv) agree to proceed with implementation of the software in limited installments on a country-by-country basis without UAT and acceptance.

119.    Defendant's motive was to ensure that Vanguard continued paying Defendant. Another motive was to make Vanguard dependent on the Software and Defendant by pushing the deployment beyond the first 7 countries.   The more dependent Vanguard was on Defendant, the more likely it would be to overlook the Software's lack of functionality and its numerous defects and ultimately accept Software that did not meet Vanguard's requirements.  In addition, there was a motive to push Vanguard to bring the Software live so that Defendant would not allege breach and instead work to fix the nonconforming Software.

120.    Vanguard reasonably relied upon Braun's misrepresentations because upon completion of the Blueprint process, there could be no ambiguity with what Vanguard required for its global operations.

121.    Moreover, as a means to show its good faith, Braun acknowledged it had not met the UAT requirements and that it was not entitled to the additional payment of $400,000 associated with completion of the UAT and acceptance of the Software.

122.    Defendant promised and was required to deliver the Software with the Big 10 functionalities under the Agreement.

123.    In reality, upon information and belief, Defendant knew it did not have the capability to fix the Software, pass the UAT and obtain Vanguard's acceptance.  Instead, upon information and belief, Defendant hoped to make Vanguard more reliant on Defendant and pay Defendant more.

124.    Had Vanguard known the extent of Defendant's lack of knowledge and capabilities, it never would have agreed to forgo the Amendment and start with live implementation.

125.    As discussed below, relying on Defendant's false representations, Vanguard paid Defendant millions more anticipating delivery of the Big 10 functionalities, and spent even more internally in reliance upon Defendant's misrepresentations.

126.    As of the date of this Complaint, Defendant has not delivered the Software with all of the Big 10 functionalities.

### The Software Is Implemented in Costa Rica and Australia, and the Results Are Disastrous

127.    In September 2016, a pilot implementation of Defendant's software was implemented in Costa Rica.  Costa Rica was chosen for its simplicity and small operations. Costa Rica had only about 8-10 people involved in the operations and was a very straightforward and simple operation involving ocean freight consolidation and LCL services only.  Furthermore, there was no integration necessary for the software to run the operation in Costa Rica.  As such, Costa Rica was not an accurate representation of Vanguard's operations globally.

128.    Next, in April 2017, the Software was implemented in New Zealand and Australia on a trial basis.  A key feature to be tested with this next stage was the ability of the Software to provide end-to-end visibility as the cargo was moved between the two countries.  In addition, the Vanguard team in Australia was large, experienced, and well-run.  Accordingly, it offered an

appropriate stress test of the Software.

129.    The Australia/New Zealand implementation revealed extensive problems with Defendant's Software and Defendant's Professional and Support Services.

130.    Immediately upon implementation in all three countries, bugs and other defects in the Software were discovered.  It was clear the Software was not nearly sophisticated enough, complex enough, or developed enough to be functional for Vanguard.  The Software issues included, but were not limited to, system freezes and lock-ups, as well as extreme delay in response times in all functions including quoting, booking, advanced routing, changing owner IDs, and adding party IDs.  Many of these bugs and defects were never resolved or took over a year to resolve.

131.    During the initial test implementation in Australia and New Zealand, only a small fraction of the total number of possible users were using the program; the delay issues would be compounded when all of Vanguard's employees were using the Software.  If not fixed, this delay caused by Defendant's Software would prevent any attempt at a worldwide rollout without significant changes.  As discussed below, Defendant misrepresented that Version 18.1 would provide such changes.  Again, this was not true.

132.    The Software also lacked basic integration functionality and a lack of understanding of Vanguard's industry.  As just one example, Defendant's Software used the term POD to represent "Port of Delivery."  However, there are numerous other standard ocean logistics terms with the initials POD, including but not limited to "Port of Destination," "Port of Discharge," "Proof of Delivery," "Point of Distribution," or "Pay on Delivery."  By using POD, it created disarray in the system by having multiple different definitions in multiple different data tables.  A company that claimed to be an expert and understand the transportation and logistics

industry should at least be aware of the potential for confusion created by the sloppy use of these types of abbreviations.  Defendant also lacked a basic understanding of Vanguard's business and what was required to meet its functionality requirements.  As a result, Vanguard was forced to spend hours of its time and resources teaching Defendant basic concepts so that they could customize the Software as it had previously claimed it understood Vanguard needed and it could provide.

133.    Another example was the Hazardous Segregation Table.  There are numerous restrictions regarding what cargo can be transported with Hazardous cargo.  This functionality is meant to track those restrictions and automatically identify any cargo that would violate them. Defendant represented it possessed this functionality, but it turned out Defendant's functionality consisted of a simple essentially useless table that lacked any reference to the full list of restrictions.  In short, Defendant's Software was primitive compared to the version that Vanguard had been using since 1984.

134.    The Australia/New Zealand test also revealed the extent of the defects and lack of functionality of Defendant's Software and Defendant's unprofessional and substandard software development capabilities.  The sheer number of patches and hot fixes Defendant issued were highly unusual and far outside the norm for similar software development projects.

135.    Moreover, the number of times Defendant had to deploy a hot fix to correct an error in a previous software hot fix was completely unprecedented.  In other words, Defendant made an error in the original Software deployment, which had to be fixed and then fixed again. For this to happen more than a handful of times is highly unusual for software development projects.  In the case of Defendant's deployment of Software in Australia, nearly a third of hot fixes required an additional hot fix.  Defendant's repeated issuance of "patches on top of

patches," does not comply with the performance of Professional Services in a professional and workmanlike manner.

136.    Meanwhile, Defendant blamed everything on Vanguard never admitting its own Software was to blame.  Indeed, many of the issues that Defendant identified could not possibly be or were unlikely to be the cause.  For example, Defendant tried to blame the IBM Sterling EDI software program, a widely used and globally respected product, when that program was not even integrated into Defendant's system and therefore could not possibly have been the cause of any delays.  Likewise, Defendant suggested that Vanguard turn off its Oracle Query Optimizer features (an artificial intelligence program for managing software requests)[1], which is not industry standard and again did not resolve the issues. Similarly, Defendant tried to blame Vanguard's hardware (cache/memory) capacity.  Vanguard paid over $30,000 to upgrade this capacity, but the upgrade had no effect on the functionality and speed of Defendant's Software.

137.    Vanguard attempted to do everything on its side to improve the performance of the platform: it ran diagnostic processes for Defendant, which was complicated by Defendant's failure to provide adequate documentation; it increased the cache/memory (at Defendant's request) so its system could function at an optimal level; it turned off Oracle Query Optimizer features at Defendant's request; it asked Defendant how other customers using the AIX Operating System and 8 Production Servers like Vanguard were plagued by these issues and configured their software to optimize performance.

138.    Defendant then stated for the first time that it had only one customer as big or

---

[1]    The query optimizer determines the most efficient way to execute a SQL statement after considering many factors related to the objects referenced and the conditions specified in the query.  This determination is an important step in the processing of any SQL statement and can greatly affect execution time.

bigger than Vanguard, and that no other customer utilized or required all the other functionalities

that Vanguard required.  Indeed, none its customers used the full suite of Defendant's software

products that Vanguard had contracted to use.  Meaning despite representing its global integrated

platform and its worldwide customer base, Defendant's alleged customers were only using a

small part of Defendant's system.

139.    The failure of the Software and Defendant's failure to provide Professional and

Support Services in a professional and workmanlike manner constituted material breaches of the

Agreement.

### *Defendant Falsely Claims Version 18.1 Will Solve the Software Performance Issues*

140.    In mid-2018, Defendant deployed version 18.1 of the Software, falsely claiming it

would cure the defects identified in the Australia rollout.  In addition, at that time, Defendant

reiterated its commitment to delivering the Big 10 functionalities.

141.    Defendant reasonably relied upon these representations in agreeing to continue

with the country by country deployment in the UK, Italy, Spain, Chile and Mexico.

142.    Once again, the Software required multiple patches and hot fixes.  It also

underwent additional testing that Vanguard paid for and still, when it was deployed in the UK it

still had significant issues.  For example, Vanguard had to roll-back the export operations

implementation in the UK for a year because the Software was not ready.

143.    The deployment also revealed Defendant's lack of Statutory Coverage capabilities

and understanding.  As discussed *supra* in paragraphs 18 through 37, during the solicitation

process, Defendant claimed to have extensive experience and capabilities providing Statutory

Coverage in these countries.  However, years later when it came time to implement its Software,

it did not work and Defendant did not know the statutory requirements.  As a result, Vanguard

was forced to spend millions in additional time, resources and fees to Defendant due to the major

issues Defendant had integrating and developing a platform to satisfy the Statutory Requirements in those countries.

144.    For example, in Mexico there is a triangular system of invoicing and communication between the NVOCC, the governmental entity, and the customer.  Since Defendant represented itself as operational with regards to Booking/Invoicing, Defendant should have known and had the functionality to facilitate the exchange of information between the NVOCC, government, and customer to ensure that Vanguard received payment for shipments into and out of Mexico.

145.    To be operational in Europe, there must be functionality that adequately calculates the applicable rates to the specific services provided.  For example, the calculations of VAT, Sales Tax, and Excise Tax at certain points throughout the transport process; all things necessary to be able to conduct business operations through and with local governments.  During the solicitation process, Defendant falsely represented that it could meet these financial statutory requirements by assigning and calculating the applicable rates to the specific services provided.  This was not true.  Years later, Defendant attempted to implement the software in Italy and Spain, two countries in which it claimed to have extensive experience.  In fact, Defendant did not know the tax requirements in Italy and Spain, nor could it provide a software platform with the requisite functionality.

146.    As of the date of this Complaint, Defendant still has not delivered, not does it even possess, the integration and compliance functionalities required to operate in conjunction with local governments to meet the statutory requirements.  Indeed, in the nearly six years since representing it did have these capabilities, there has been no evidence it ever knew or understood what the country requirements were.

147.    Defendant's failure to provide Statutory Coverage as promised, has caused Vanguard extensive damage.  These gaps required significant delays in the development of the platform and a significant delay in the implementation ("go-live") of the platform in these countries resulting in Vanguard wasting millions of dollars educating Defendant about issues it claimed to have known.  It also caused Defendant to spend millions in additional fees to Defendant to fix the issues it would not have otherwise had to spend.

148.    In addition, after Version 18.1 was implemented and updated, the performance of the platform continued to get worse.  After the implementation and poor performance of Version 18.1, there was a deep dive and analysis into the management and the optimization to attempt to solve the problems.  Again, costing Vanguard millions in paid to Defendant as well as millions spent internally.

149.    Given multiple opportunities to cure the software defects, Defendant still had not cured the non-confirming Services and Software.

150.    Moreover, Defendant still has not provided some Software products, the Big 10 functionalities, nor a fully integrated platform.

151.    Defendant failed to deliver a functional Kewill Warehousing Software or Kewill Control Tower Software as promised in the Agreement, Exhibit A table.  It failed to deliver an integrated software platform of these products cataloged in the Exhibit A table.  Furthermore, it failed to provide the Statutory Coverage functionality as promised in Section 8 of the Support Agreement.

152.    Based on delays and poor implementation into the previously mentioned countries, it is clear that at the time of solicitation, that Defendant falsely represented and purported itself to be functional and operational in a multitude of countries based on the industry

standard use of the term "operational."

***Defendant Admits Its Failure to Deliver the Functionality It Promised***

153.    In or around February 2019, Defendant appointed yet another CEO and a new senior management team.  Shortly thereafter, in or around May 2019, Defendant's Chief Operating Officer, Tim Hinson ("Hinson"), met with Vanguard.  During that meeting, Hinson admitted Defendant's failure to deliver what it had promised 5 years earlier.  This time, however, Defendant made no attempt to promise it could still comply with the original Agreement and deliver what was promised.

154.    Faced with the mounting evidence of its fraud and multiple material breaches of the Agreement, Defendant all but admitted its fraud.  In a series of presentations to Vanguard in July to September 2019, Defendant admitted, as it had to, that it had not delivered the Big 10 functionalities it agreed to, much less a fully operational software product in compliance with the Blueprint.

155.    First, Defendant admitted it failed to deliver the capabilities and functionalities they purported to possess at the outset.  Defendant stated that they still had to deliver the "Remaining Hub Development" and "TMFF Development Required for Multi-CFS Development."

156.    Second, Defendant admitted that it still did not have a functional CFS/WMS product nor did they have a roadmap or investment program for the product.  As discussed, in 2016, Defendant acknowledged that it could not build this new functionality from scratch but promised to integrate the CFS/WMS Functionality into the Kewill Freight Forwarding and would deliver it at its own expense.  Then in 2019, Defendant stated it would not deliver this functionality unless Defendant paid for it at a cost of $6.5 million to $8 million and that it would take several more years to complete.

157.    Third, Defendant acknowledged that they had still not performed "compliance pieces" and "essential government compliance" and listed them as deliverables to be performed at an additional cost (1600+ hours) and with an estimation of completion stretching into 2021. Once again, these statutory compliance requirements were functionalities that Defendant represented it had during the solicitation process five years earlier.

158.    Fourth, Defendant proposed an implementation workshop to consider "what type of resource is required per country, onsite requirements, etc." and for Vanguard "to provide any country specific requirements that may delay a country rollout." Even after multiple years of development, implementation, and apparent expertise in statutory requirements and country requirements, Defendant has not performed anywhere near its representations and has not delivered Vanguard any product or platform close to the representations or functionalities required.

159.    In sum, Defendant informed Vanguard that it will not deliver what was promised and instead will provide only a small portion of the functionality promised at a minimum cost of an additional $810,000 per quarter and an additional delay of at least 24 to 36 months. In other words, a project that was originally represented to take 18 months and $3.7 million was now going to cost an additional $6.5 million to $8 million and take several more years. Meaning the project would now cost a total of over $15 million and nearly a decade to complete only a portion of what was originally contractually obligated to deliver under the Agreement.

### AS AND FOR A FIRST CAUSE OF ACTION
### FOR BREACH OF CONTRACT

160.    Vanguard repeats and re-alleges every allegation contained in paragraphs 1 through 159 as if fully set forth herein.

161.    The Agreement is a valid and binding contract between Vanguard and Defendant.

162.     Vanguard has fully performed all of its duties and obligations under the Agreement.

163.     As detailed throughout this Complaint, Defendant has repeatedly breached the Agreement.

164.     Defendant breached the Agreement by failing to configure the Software and deliver the functionality per the functional design documents referenced in Section 9.2 of the General Terms and Conditions for Vanguard in accordance with the Blueprint.

165.     Specifically, and without limitation, Defendant never delivered all of the Software necessary to complete user acceptance testing.  Defendant never delivered the full Software product with all necessary modules, requirements, and interfaces.  And the software that Defendant did deliver for user acceptance testing failed and was rejected.

166.     Defendant breached the General Terms and Conditions by never delivering the Kewill Warehousing product to Vanguard.

167.     Defendant breached the General Terms and Conditions by never delivering the Kewill Control Tower product to Vanguard.

168.     Defendant breached the General Terms and Conditions by failing to fix non-conforming software.

169.     Defendant's unmodified software and deliverables did not perform in all material respects with the Documentation in effect at the applicable time, in breach of the General Terms and Conditions.

170.     For example, and without limitation, Defendant's Warehousing product, which was to include a Container Freight Station, never performed at all.  As recently as 2019, Defendant threatened that it would not deliver a working Container Freight Station unless

Vanguard paid Defendant another $6.5 million to $8 million.

171.    Defendant also breached the Agreement by failing to perform the Professional Services in a professional and workmanlike manner.  This includes, but is not limited to, the multiple times Defendant delivered software patches to fix prior defective software patches.

172.    Defendant breached the Agreement by failing to re-perform the Services.

173.    Defendant breached the Agreement by failing to undertake at its own expense to correct the non-conforming portion of the Services and Software.

174.    Specifically, and without limitation, Defendant has failed to deliver certain portions of the Software altogether and refused to fix correct the non-conforming portions of the Software it had delivered at its own expense.

175.    Defendant did not utilize commercially reasonable efforts to resolve defects and errors in the Software and Documentation, in breach of the Agreement.  For example, and without limitation, Defendant never delivered the Documentation.

176.    Defendant breached the Agreement by failing to provide adequate Statutory Coverage, including but not limited to the following breaches:

    a.    Defendant breached the Agreement by failing to update or change the Software to meet the Statutory Requirements of each of the 67 countries listed in the Supported Country Deployment List.

    b.    Defendant's Software has never provided the required functionality with regard to the Statutory Requirements.

    c.    Defendant breached the Agreement by failing to have the functionality required to meet the Statutory Requirements in the 38 additional countries listed under the Supported Country Deployment by 2014.

d.      Defendant breached the Agreement by failing to update or change the Software to meet the Statutory Requirements of each of the 38 additional countries listed under the Supported Country Deployment by 2014.

e.      In fact, Defendant did not deploy its Software in those 38 additional countries in 2014, much less demonstrate Statutory Coverage for those countries.

177.    Defendant repeatedly failed to meet its incident handling obligations, in breach of Section 5 of the Support Agreement.

178.    Defendant breached its obligations under Section 8 of the Support Agreement by failing to provide Software customizations to meet the functionalities identified in Section 8 of the Support Agreement.

179.    Defendant breached the Agreement by failing to deliver the Big 10 functionalities identified during the Blueprint process.

180.    Defendant breached the Agreement by never providing the technical training services required by Section 9 of the Support Agreement.

181.    Defendant breached the Agreement by failing to have adequate personnel to address the requirement of each Work Order and deliver within the agreed timeframes.

182.    Defendant breached the Agreement by failing to provide personnel, expertise, and the professional, technical, and project management services called for in the Work Orders.

183.    Defendant breached the Agreement by failing to provide and deliver to Vanguard the Deliverable(s) described in the Work Orders in material compliance with the requirements for each such Deliverable(s).

184.    Defendant breached the Agreement by failing to perform all of its respective

obligations in accordance with the applicable Work Orders.

185.    On multiple occasions, Vanguard notified Defendant in writing that the software that it had delivered did not conform to the acceptance criteria set forth in the Work Order(s).

186.    After Vanguard notified Defendant in writing that Deliverable(s) did not conform to the acceptance criteria, Defendant breached the Agreement by failing to correct such nonconformity within 10 business days of receipt of the written notice.

187.    Each of Defendant's breaches was a material breach of the Agreement.

188.    As a result of each of Defendant's breaches of the Agreement, Vanguard has been damaged.

189.    As a direct and proximate result of Defendant's breaches of the Agreement, Vanguard has been damaged in an amount to be determined at trial but believed to exceed $15 million plus all additional costs, interests, and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR FRAUDULENT INDUCMENT

190.    Vanguard repeats and re-alleges its allegations in paragraphs 1 through 189 as if fully set forth herein.

191.    Prior to entering into the Agreement and as an inducement to Vanguard to enter into the Agreement, Defendant made a series of misrepresentations regarding Defendant's Software functionality, Defendant's development capabilities, Defendant's experience, and Defendant's understanding of and ability to meet Vanguard's software requirements.  These misrepresentations include but are not limited to the following:

    a.    Misrepresenting the functionality of Defendant's existing software products.

    b.    Misrepresenting that Defendant's software products met nearly all of the functionality requirements that Vanguard identified during the solicitation

process.

c.      Misrepresenting that Defendant's existing software products required only

minimal customization to meet Vanguard's requirements.

d.      Misrepresenting that Defendant's Kewill Control Tower software product existed

and was functional.

e.      Misrepresenting that Defendant's Kewill Warehousing software product existed

and was functional.

f.      Misrepresenting that the following Kewill CFS/WMS Functionalities matched

Vanguard's requirements: Sea Air Operations – Billing: internal costs; Sea and

Air Operations – Transshipment (3rd Party Transshipments, Transshipment

Consolidations, Multimodal Transshipments); Warehouse Enhancement – Status

Update; Warehouse Enhancement – Tracking; and Warehouse Enhancement –

Packing Certificate.

g.      Misrepresenting that any software functionalities that Defendant did not possess,

Defendant could develop and add the functionalities to its software platform.

h.      Misrepresenting that Defendant's Move Suite, consisting of the following

products—(1) Kewill Freight Forwarding; (2) Kewill Contracts and Rate

Management; (3) Kewill Warehousing; and (4) Kewill Control Tower—were

fully integrated and seamlessly interfaced with each other.

i.      Misrepresenting Defendant's experience with, understanding of and technical

capability to provide Statutory Coverage in the countries that Vanguard operated.

j.      Misrepresenting that Defendant's existing software had a hub and gateway

processing functionality.

k.      Misrepresenting Defendant's software development capabilities and experience.

192.    Upon information and belief, each of these representations were false at the time they were made prior to execution of the Agreement.

193.    Upon information and belief, Defendant knew each of these representations were false at the time they were made prior to execution of the Agreement.

194.    Upon information and belief, Defendant made each of these representations with the intent of inducing Vanguard's reliance upon them to enter into the Agreement with Defendant.

195.    Vanguard reasonably relied on each of these misrepresentations in selecting Defendant among the other vendors that participated in the solicitation process and entering into the Agreement with Defendant.

196.    Had Vanguard known any one of these representations were false, Vanguard would not have selected Defendant and entered into the Agreement.

197.    As a result of and in reliance upon Defendant's fraudulent misrepresentations, Vanguard suffered extensive damages, including but not limited to the $7.7 million Vanguard paid Defendant; and the over $20 million Vanguard invested in the software development project, including but not limited to third party vendor costs, hardware purchased, addressing Defendant's breaches, and other internal Vanguard costs.  Vanguard also suffered lost profits and consequential damages, in an amount to be determined at trial.

198.    As a result of Defendant's fraud, Vanguard has been damaged in an amount to be determined at trial but believed to exceed $27 million.

199.    Vanguard is also entitled to punitive damages as a result of the Defendant's fraudulent behavior.

## AS AND FOR A THIRD CAUSE OF ACTION
## FOR FRADULENT MISREPRESENTATION NO. 1

200.    Vanguard repeats and realleges its allegations in paragraphs 1 through 199 as if fully set forth herein.

201.    Throughout the Blueprint process, Defendant continued to conceal the truth of misrepresentations identified in paragraph 191.

202.    Defendant misrepresented its existing software functionality after the Blueprint Process concluded.  Defendant continued to misrepresent its existing software functionality even after 800 of the Vanguard requirements were considered gaps.

203.    Defendant continued to make these misrepresentations because if Vanguard was aware of the true number of gaps in the software, and Defendant's inability to customize the software to meet Vanguard's business needs, Vanguard would have rejected the Blueprint and terminated the Agreement.

204.    Defendant's misrepresentations after the Blueprint Process include but are not limited to the following:

a.      Misrepresenting the functionality of Defendant's existing software products.

b.      Misrepresenting the extent to which Defendant's existing software products met the functionality requirements that Vanguard identified during the solicitation process.

c.      Misrepresenting that there were "no more gaps" between Defendant's Software functionality and Vanguard's requirements.

d.      Misrepresenting that Defendant's Kewill Control Tower software product existed and was functional.

e.   Misrepresenting that Defendant's Kewill Warehousing software product existed and was functional.

f.   Misrepresenting that the following Kewill CFS/WMS Functionalities matched Vanguard's requirements: Sea Air Operations – Billing: internal costs; Sea and Air Operations – Transshipment (3rd Party Transshipments, Transshipment Consolidations, Multimodal Transshipments); Warehouse Enhancement – Status Update; Warehouse Enhancement – Tracking; and Warehouse Enhancement – Packing Certificate.

g.   Misrepresenting that any software functionalities that Defendant did not possess, Defendant could develop and add the functionalities to its software platform.

h.   Misrepresenting that Defendant's Move Suite, consisting of the following products—(1) Kewill Freight Forwarding; (2) Kewill Contracts and Rate Management; (3) Kewill Warehousing; and (4) Kewill Control Tower—were fully integrated and seamlessly interfaced with each other.

i.   Misrepresenting Defendant's experience with, understanding of and technical capability to provide Statutory Coverage in the countries that Vanguard operated.

j.   Misrepresenting that Defendant's existing software had a hub and gateway processing functionality.

k.   Misrepresenting Defendant's software development capabilities and experience.

205.   Upon information and belief, each of these representations were false at the time they were made subsequent to the Blueprint Process.

206.   Upon information and belief, Defendant knew each of these representations were false at the time they were made subsequent to the Blueprint Process.

207.    Vanguard reasonably relied on each of these misrepresentations in continuing to work with Defendant after the Blueprint Process and not terminating the Agreement.

208.    Had Vanguard known any one of these representations were false, Vanguard would not have not accepted the Blueprint and would have terminated the Agreement.

209.    As a result of and in reliance upon Defendant's fraudulent misrepresentations, Vanguard suffered extensive damages, including but not limited to a portion of the $7.7 million Vanguard paid Defendant; and a portion of the over $20 million Vanguard invested in the software development project.  Vanguard also suffered lost profits and consequential damages, in an amount to be determined at trial.

210.    As a result of Defendant's fraud, Vanguard has been damaged in an amount to be determined at trial but believed to exceed $27 million.

211.    Vanguard is also entitled to punitive damages as a result of the Defendant's fraudulent behavior.

### AS AND FOR A FOURTH CAUSE OF ACTION
### FOR FRADULENT MISREPRESENTATION NO. 2

212.    Vanguard repeats and realleges its allegations in paragraphs 1 through 211 as if fully set forth herein.

213.    Throughout the Software testing period, Defendant continued to conceal the truth of the misrepresentations identified in paragraphs 191 and 204.

214.    Defendant perpetuated a continuation of its misrepresentations by pretending to enter into a good-faith amendment negotiation process.

215.    Defendant acknowledged that it was in breach of the Agreement and that the Agreement required delivery of the Big 10 functionalities.  Furthermore, Defendant acknowledged that its prior representations about the CFS/WMS Functionality were untrue.

216.    However, Defendant's CEO made representations that an amendment was unnecessary because Defendant understood what was required to meet Vanguard's requirements and that it was capable and committed to delivering the platform.

217.    Upon information and belief, each of these representations were false at the time they were made by the CEO during the Software Testing period.

218.    Upon information and belief, Defendant knew each of these representations were false at the time they were made by the CEO during the Software Testing period.

219.    Vanguard reasonably relied on each of these misrepresentations in (1) not invoking its rights to terminate the Agreement; (2) foregoing the Amendment; and (3) agreeing to proceed with the live implementation of the software in limited installments country-by-country.

220.    Had Vanguard known any one of these representations were false, Vanguard would not have forgone the Amendment and/or terminating the Agreement.

221.    Vanguard reasonably relied on each of these misrepresentations in continuing to work with Defendant through the Software Testing and the country-by-country Implementation.

222.    As a result of and in reliance upon Defendant's fraudulent misrepresentations, Vanguard suffered extensive damages, including but not limited to a portion of the $7.7 million Vanguard paid Defendant; and a portion of the over $20 million Vanguard invested in the software development project.  Vanguard also suffered lost profits and consequential damages, in an amount to be determined at trial.

223.    As a result of Defendant's fraud, Vanguard has been damaged in an amount to be determined at trial but believed to exceed $27 million.

224.    Vanguard is also entitled to punitive damages as a result of the Defendant's

fraudulent behavior.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR FRADULENT MISREPRESENTATION NO. 3

225.    Vanguard repeats and realleges its allegations in paragraphs 1 through 224 as if fully set forth herein.

226.    Throughout the Australia and New Zealand implementation, Defendant continued to conceal the truth about its misrepresentations identified in paragraphs 191 and 204.

227.    Defendant misrepresented that Version 18.1 of the Software would solve the performance issues after the Australia and New Zealand implementation.

228.    Defendant misrepresented to Vanguard that the performance issues and platform issues that occurred in Australia and New Zealand would be fixed after the implementation of the Version 18.1.

229.    Upon information and belief, each of these representations were false at the time they were made by the Defendant.

230.    Upon information and belief, Defendant knew each of these representations were false at the time they were made by the Defendant.

231.    Vanguard reasonably relied on each of these misrepresentations in not terminating the Agreement after the poor results of the country implementations into Costa Rica, Australia, and New Zealand.

232.    Had Vanguard known that these representations were false, Vanguard would have terminated the Agreement.

233.    Vanguard reasonably relied on each of these misrepresentations in continuing to work with Defendant after the implementation of Version 18.1.

234.    As a result of and in reliance upon Defendant's fraudulent misrepresentations,

Vanguard suffered extensive damages, including but not limited to a portion of the $7.7 million Vanguard paid Defendant; and a portion of the over $20 million Vanguard invested in the software development project.  Vanguard also suffered lost profits and consequential damages, in an amount to be determined at trial.

235.    As a result of Defendant's fraud, Vanguard has been damaged in an amount to be determined at trial but believed to exceed $27 million.

236.    Vanguard is also entitled to punitive damages as a result of the Defendant's fraudulent behavior.

## AS AND FOR A SIXTH CAUSE OF ACTION
## FOR UNJUST ENRICHMENT

237.    Vanguard repeats and realleges its allegations in paragraphs 1 through 236 as if fully set forth herein.

238.    Defendant was unjustly enriched at Vanguard's expense.  Defendant never delivered anything of value to Vanguard, yet Vanguard paid Defendant $7.7 million.

239.    Equity and good conscience require that Defendant return monies that Vanguard paid to it, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Vanguard Logistics (USA), Inc., formerly known as NACA Logistics (USA), Inc., demands the following relief:

(a)    On the First Cause of Action, damages in an amount to be determined at trial, but believed to be no less than $15 million, plus all additional costs, interest, and attorneys' fees;

(b)     On the Second Cause of Action, damages in an amount to be determined at trial, but believed to be no less than $27 million, plus all additional costs, interest, and attorneys' fees;

(c)     On the Third Cause of Action, damages in an amount to be determined at trial, but believed to be approximately $27 million, plus additional costs, interest, and attorneys' fees;

(d)     On the Fourth Cause of Action, damages in an amount to be determined at trial, but believed to be approximately $27 million, plus additional costs, interest, and attorneys' fees;

(e)     On the Fifth Cause of Action, damages in an amount to be determined at trial, but believed to be approximately $27 million, plus additional costs, interest, and attorneys' fees;

(f)     On the Sixth Cause of Action, damages in an amount to be determined at trial, but believed to be no less than $7.7 million, plus additional costs, interest, and attorneys' fees; and

(g)     Such other and further relief as the Court deems just and appropriate.

(The remainder of this page is intentionally left blank.)

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues triable to a jury.

Dated:  New York, New York
June 8, 2020

VENABLE LLP

By:  /s/ Thomas J. Welling, Jr.
Frank Gasparo
Thomas J. Welling, Jr.

1290 Avenue of the Americas
New York, New York 10104
212.503.0588
FMGasparo@Venable.com
TJWelling@Venable.com

*Attorneys for Plaintiff Vanguard Logistics
(USA), Inc. f/k/a NACA Logistics (USA), Inc.*